UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
FORT WAYNE DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | CASE NO.: 1:20-CR-57-HAB |
| | ) | |
| FRANKLIN D. WRIGHT | ) | |

## OPINION AND ORDER

The Government charged Defendant, Franklin Wright ("Wright"), in a single count indictment with being a felon in possession of a firearm, in violation of 18 U.S.C. § 922(g)(1). (ECF No. 1).[1] This matter is before the Court on the Defendant's Motion to Suppress Evidence (ECF No. 16) filed on November 30, 2020. The Defendant requests that the Court suppress a handgun obtained from the search of the vehicle in which he was a passenger at the time of his arrest on August 4, 2020.

On February 5, 2021, the Court held an evidentiary hearing on the motion. After the filing of the transcript from that hearing, the Defendant filed an opening brief (ECF No. 31) to which the Government responded on May 7, 2021 (ECF No. 34) and the Defendant replied on May 28, 2021 (ECF No. 37). For the following reasons, the Court will DENY the Defendant's Motion to Suppress.

## FACTUAL BACKGROUND

In the early morning hours of August 4, 2020, Fort Wayne Police Department (FWPD) Officer Zachary Chapman (Officer Chapman) was working the overnight patrol shift in the Northeast District Patrol. At the time, Officer Chapman was training FWPD Officer Roderick

---

[1] The Indictment also contains a forfeiture allegation.

Waters (Officer Waters), an officer with eight months on the job. Both officers were wearing full police uniforms and patrolling in a marked FWPD Ford Explorer equipped with lights and a siren.

At approximately 2:48 a.m., the officers were patrolling in the area of a CVS store on East State Street in Fort Wayne. Officer Chapman testified that he often patrolled in that area as it was a high call volume area and that on this particular day they were patrolling the parking lot. (Evid. Hr'g Tr., ECF No. 28, at 8). While on patrol, Officer Chapman observed a vehicle parked in a handicap spot outside the CVS store that did not appear to have a handicap placard. (*Id.*). As they drove through the parking lot, a female exited the store and walked towards the parked vehicle. Officer Chapman observed her look in the direction of the police vehicle, and immediately turn and re-enter the store. (*Id.* at 9). From his experience working armed robberies in that location, Officer Chapman testified that he found this behavior suspicious because "[w]e have a lot of thefts from the stores overnight…I believed it was suspicious her seeing a police vehicle and then just going back inside…" (*Id.*). [2] Officer Chapman then ran the license plate for the vehicle which returned to a 2017 Kia; however, the vehicle in question was a Chevrolet Malibu. (*Id.*).

At this point, Officer Chapman had observed two citable violations involving the vehicle: parking in a handicap spot without a proper placard and operating a vehicle with a plate not registered to the vehicle. He then pulled across the street to continue monitoring the vehicle. Once there, he observed the same female he initially saw exit the store enter the vehicle on the driver side. The vehicle then left the parking spot and proceeded through the parking lot toward the exit

---

[2] Wright disputes how Officer Chapman could have known for certain what the female saw or why she went back into the store. The Court agrees with Wright that the reason for the female returning to the store could have been completely innocent and unrelated to the police vehicle. In fact, there is a complete absence of any direct testimony on the point. However, what is important is how Officer Chapman, based on his training and experience, interpreted that conduct, not whether he was correct in his interpretation. Additionally, as set forth later in this factual recitation, Officer Chapman observed additional suspicious behavior which further bolstered his initial interpretation.

on Beacon Street. At that point, Officer Chapman believed the female driver spied his police vehicle again because the vehicle waited in the parking lot for a few minutes before pulling out southbound onto Beacon Street towards Lake Avenue. (Hr'g Tr. at 10–11). When the vehicle pulled out, Officer Chapman noted a third traffic infraction – the license plate light was not illuminated on the vehicle – and he began following the vehicle. As he followed the vehicle, he observed it make a wide turn onto Lake Avenue and traveling left of center. At this point, he initiated a traffic stop and activated his in-car camera. (*Id.* at 12). The entirety of the stop is captured on Officer Chapman's in-car camera and was submitted as Government's Exhibit 1 at the hearing.

The vehicle stopped in the 1800 block of Randalia. (Hr'g Tr. at 12). From his vehicle, Officer Chapman observed multiple passengers moving about the vehicle, but he was unable to identify the number of vehicle occupants at the time of the stop. He radioed dispatch to notify it that he had initiated a traffic stop and the location of the stop. He also notified dispatch that the plate didn't return to vehicle and that there were multiple vehicle occupants. (*Id.* at 13). Officer Will Winston was patrolling in the area and arrived as backup shortly thereafter.

In the meantime, both Officers Chapman and Waters exited the police vehicle and approached it from their respective sides; Officer Chapman on the driver's side and Waters on the passenger's side. (Hr'g Tr. at 14). As he approached the driver's side rear of the car, Officer Chapman observed two males in the back seat. The male on the driver side was "crouched down and he had leaned up from underneath the driver seat." (*Id.*). When asked about this behavior, Officer Chapman testified as follows:

> Q: Did that behavior concern you?
> A: It did, yes.
> Q: Why did it concern you?

3

> A: I believed that he was concealing something that he didn't want law enforcement to know about.
>
> (*Id.*) ….
>
> Q: …When you see behavior like that, have you in the past commonly found weapons or other types of firearms, or knives, or other type weapons?
> A: I have.
> Q: In the location of where that movement took place?
> A: Correct.
> Q: When you saw that movement, did you believe that there might be a weapon involved that could harm you or your partner?
> A: Possibly, yes.

(*Id.* at 15).

As Officer Waters approached the vehicle, he used his flashlight to illuminate the back seat. Both officers observed the passenger side rear occupant with his body turned away from Officer Waters and his hands inside a bag. (Hr'g Tr. at 15, 68). Officer Waters directed the occupants to roll the window down and, when they did so, Officer Waters confirmed the occupant's hands inside what was described as a "Gucci-looking" bag. (Hr'g Tr. at 68). Officer Chapman ordered the individual, later determined to be Wright, to show his hands. Wright then withdrew his right hand but kept his left hand inside of the bag.[3] Officer Chapman interpreted these actions as suspicious and an attempt to conceal something in the bag from officers. (*Id.* at 16). Officer Chapman repeated the order to Wright to show his hands and he then complied by removing his left hand from the bag.[4]

---

[3] Officer Waters testified that he ordered Wright to take his hands out of the bag and Wright responded that his hands "weren't in the bag." (Hr'g Tr. at 68). Officer Waters further testified that based on the furtive movements he observed at the beginning of the stop and Wright's hands in the bag, he believed that there could be contraband in the vehicle and possibly a gun. (*Id.* at 73, 80).

[4] Wright argues that he was compliant with all requests from the officers and that the in-car camera video confirms his hands were visible outside the window after the request from the officers. There is no serious dispute that Wright and the other occupants complied with all commands given, did not resist their removal from the vehicle or the pat down search that eventually occurred.

4

By now, Officer Winston had arrived and joined Officer Waters alongside the passenger side of the the vehicle. Officer Chapman instructed them to remove Wright from the vehicle. Officer Winston removed Wright from the vehicle, patted him down, and seated him on the curb approximately 10 feet from the vehicle. (Hr'g Tr. at 89–90). The officers then proceeded to remove the driver's side rear seat passenger next followed by the two front seat female occupants. All occupants were patted down and seated on the curb. No weapons or contraband were found on any of the four individuals and none of the individuals were placed in handcuffs. (Hr'g Tr. at 20).

With all four occupants removed from the vehicle, frisked for weapons, and seated on the curb away from the vehicle, Officer Chapman decided to search the vehicle. Officer Chapman testified that he based this decision on concerns from his prior law enforcement experience that the occupants could still get access to anything inside the vehicle or that they may attempt to get into the car to flee. (Hr'g Tr. at 60). Additionally, he had concerns over the suspicious behavior he had observed and the movements of the occupants when the vehicle was pulled over that their may be contraband in the car. Officer Winston likewise testified that he has had experience with occupants getting back into a vehicle or attempting to do so after having been removed from a vehicle. (Hr'g Tr. at 90–91).

With several doors to the vehicle open, Officer Chapman began his vehicle search in the rear passenger seat where Wright had been seated. There, inside the bag that Wright had his hands inside at the beginning of the stop, Officer Chapman located a Smith and Wesson handgun with an extended magazine inserted. Officer Chapman did not immediately notify the other officers on scene about finding the firearm because "in the past, if I go directly to the area where I believe that someone who was just in possession of a weapon was at, and then I remove myself from that position, I've had people flee the scene before. I've had people resist immediately, because they

believe that I found what it is they were trying to conceal." (Hr'g. Tr. at 19–20). Instead, Officer Chapman walked around the exterior of the vehicle and closed all the doors. (*Id.* at 22). Officer Chapman then placed Wright into handcuffs and notified the other officers that he found the weapon in the vehicle. (*Id.* at 28). Wright was placed in the squad car while the other occupants were questioned about the firearm. All 3 remaining occupants denied ownership of the gun. Officer Chapman then asked Wright if the firearm was his and if he had a valid permit for the firearm at which time Wright refused to answer. Officers then ran Wright's name through their system to determine if he had a valid handgun permit. Officer Chapman noted on the in-car video that Wright was being detained pending a determination of whether he had a valid handgun permit. (Gov't Ex. 1 at 2:55:16 to 2:55:56). Wright did not have a valid handgun license and, in addition, he was a convicted felon. At that point, Wright, having been seated handcuffed in the squad car for approximately ten minutes, was formally under arrest.

Eventually, officers retrieved a Glock handgun from underneath the rear driver's side seat. This was the same area that Officer Chapman had observed the back seat driver's side passenger reaching when he approached the vehicle. The other male passenger was then arrested for felon in possession of a firearm. The two female occupants, unbeknownst to the officers on scene, provided fictitious names. They were permitted to leave with the vehicle. Officer Waters testified that if no weapons had been found inside the vehicle, all four occupants would have been permitted to leave with the vehicle. (*Id.* at 82–83).

Based upon these facts, the Defendant asserts that what began as an appropriate *Terry* stop pursuant to the authority of *Terry v. Ohio*, 392 U.S. 1 (1968), morphed into a full blown arrest without probable cause. Additionally, Wright contends that the officers had no basis to search the vehicle. For these reasons, he seeks to suppress the firearm found inside the vehicle.

**DISCUSSION**

The Fourth Amendment protects against "unreasonable searches and seizures." U.S. Const. amend. IV. "Stopping someone is generally considered a seizure and ordinarily requires probable cause to be reasonable." *United States v. Reedy,* 989 F.3d 548, 552 (7th Cir. 2021). In *Terry v. Ohio*, the Supreme Court recognized an exception to this general principle and thus, under *Terry*, a police officer can stop and briefly detain a person for investigative purposes without violating the Fourth Amendment if the officer has a reasonable suspicion supported by articulable facts that criminal activity is afoot. *Terry v. Ohio,* 392 U.S. 1, 21-22 (1968). This applies even when a police officer pulls over a vehicle for a brief traffic stop; the "officer must have at least an articulable and reasonable suspicion that the particular person stopped is breaking the law." *United States v. Rodriguez-Escalera*, 884 F.3d 661, 667-68 (7th Cir. 2018) (quoting *Delaware v. Prouse*, 440 U.S. 648, 663(1979)). The Seventh Circuit has held that the suspicion that a defendant committed a traffic offense is sufficient to create reasonable suspicion to support an investigatory stop. *See, e.g., United States v. Shields*, 789 F.3d 735, 745 (7th Cir. 2015) ("Because Mr. Shields does not dispute that he violated the Chicago Municipal Code by parking in the cross walk, the officers clearly had an objective basis to believe that he was violating the law."); *see also United States v. Muriel*, 418 F.3d 720, 724 (7th Cir. 2005) ("Probable cause exists when the circumstances confronting a police officer support the reasonable belief that a driver has committed even a minor traffic offense.").

In this case, Wright concedes the reasonableness of the traffic stop under *Terry* based upon the officers' observation of the various traffic infractions committed by the driver of the Chevy Malibu. Wright further concedes that the officers were permitted to remove the occupants of the vehicle during their investigation of the traffic violations, see *Maryland v. Wilson*, 519 U.S. 408,

7

413-14 (1997) (holding that an officer may order a driver and passengers out of the car during a traffic stop because of the "weighty interest in officer safety" and the inherent dangers of traffic stops), and pat them down for weapons. For its part, the Government concedes that the actions of the officers constituted a "seizure" under the Fourth Amendment and that the vehicle occupants were not free to leave, *see e.g. Terry,* 392 U.S. 1; *California v. Hodari D.,* 499 U.S. 621, 628 (1991) ("seizure" occurs when a reasonable person would not feel free to "disregard the police and go about his business"); *Florida v. Bostick*, 501 U.S. 529 (1991) ("seizure" occurs when the police conduct would have communicated to a reasonable person that the person was not free to decline the officers' requests or otherwise terminate the encounter). But this is where the parties' concessions end. Wright asserts that the officers' actions after removing him from the vehicle and frisking him for weapons transformed the stop from a permissible *Terry* encounter into a full-blown arrest lacking probable cause. The Government, in turn, asserts that Wright's detention only turned into an arrest once the firearm was found in the vehicle and it was discovered that Wright was a felon.

In analyzing Wright's argument, the Court is ever mindful that "[t]he line between a lawful *Terry* stop and an unlawful arrest is not bright." *United States v. Askew*, 403 F.3d 496, 507 (7th Cir. 2005). Officer/citizen interactions are not static events, but often progress through the various categories of encounters as the intrusiveness or length of the police activity increases. Indeed, "'[s]ubtle, and perhaps tenuous distinctions exist between a *Terry* stop, *Terry* stop rapidly evolving into an arrest and a *de facto* arrest.'" *United States v. Bullock,* 632 F.3d 1004, 1016 (7th Cir. 2011). Police restraint may become so intrusive that, while not technically an "arrest," it becomes "tantamount" to an arrest requiring probable cause. *United States v. Tilmon,* 19 F.3d 1221, 1224 (7th Cir. 1994) (citing *Dunaway v. New York,* 442 U.S. 200, 212–16 (1979)). "Given

the 'endless variations in the facts and circumstances,' there is no 'litmus-paper test for determining when a seizure exceeds the bounds of an investigative stop' and becomes an arrest." *Id.* (quoting *Royer,* 460 U.S. at 506). Nevertheless, "a *Terry* stop comes with limits. For a stop to 'pass constitutional muster, the investigation following it must be reasonably related in scope and duration to the circumstances that justified the stop in the first instance so that it is a minimal intrusion on the individual's Fourth Amendment interests.'" *Reedy,* 989 F.3d at 552 (quoting *United States v. Robinson*, 30 F.3d 774, 784 (7th Cir. 1994)).

In support of his argument, Wright leads the Court to the recent Seventh Circuit case of *United States v. Eymann,* 962 F.3d 273 (7th Cir. 2020), wherein the court discussed the parameters of a *Terry* stop, and, in particular, reiterated the notion that "a detention must be limited in scope and executed through the least restrictive means." *Id.* at 284 (quoting *United States v. Ienco*, 182 F.3d 517, 523 (7th Cir. 1999)). Indeed, it has long been recognized that, "[a] seizure becomes an arrest when a reasonable person in the suspect's position would have understood the situation to constitute a restraint on freedom of movement of the degree which the law associates with formal arrest." *Id.* (internal quotation marks omitted). Although no single factor is conclusive, "[s]everal factors are relevant in deciding whether a *Terry* stop has become an arrest[,] including the officer's intent in stopping the individual, whether there was a search, whether, or how much, questioning occurred, whether there was a show of force and whether the person stopped could be said to have been taken into custody." *Eymann*, 962 F.3d at 284 (quoting *United States v. Rodriguez*, 831 F.2d 162, 166 (7th Cir. 1987)).

Wright argues that the *Terry* stop turned into an arrest once the vehicle occupants, and Wright specifically, were seated on the curb. He highlights the fact that two of the officers "hovered over" the occupants in case they attempted to leave, the fact that the request to get out of

9

the car was forceful in nature (as opposed to a polite request) and that one of the officers placed his hands on Wright while escorting him to the curb. Likewise, Wright makes much of the fact that the officers testified that the vehicle occupants were not free to leave once removed from the vehicle and seated on the curb. In response, the Government points out that the removal of the vehicle occupants under *Maryland v. Wilson* is permissible and that, in this case, the occupants were subject only to a temporary detention while officers investigated the traffic stop. The Court agrees and finds the temporary detention of the occupants reasonable under the Fourth Amendment.

"The fact that there is more than one occupant of the vehicle increases the possible sources of harm to the officer." *Wilson*, 519 U.S. at 413. Here, there is no question that the officers were justified in their temporary detention of the vehicle occupants. They were outnumbered, witnessed suspicious movement inside the vehicle at the outset of the stop, and Wright was literally caught with his hands in the Gucci bag when officers approached. Further, "[w]e learn little from the fact that the defendants were not free to leave…[t]hat constraint signals only that the interaction was not merely a consensual encounter." *Eymann,* 962 F.3d at 285 (citing *United States v. Williams*, 945 F.2d 192, 196 (7th Cir. 1991). While Wright takes issue with the manner in which the officers chose to conduct the temporary detention, there is no evidence that the officers did anything that would transform the seizure into an arrest. Indeed, this Court has discussed more serious force and found it permissible. *See United States v. De LaRosa-Castillo*, No. 2:20-CR-103-PPS-JEM, 2021 WL 2010621, at *7 (N.D. Ind. May 20, 2021) (officer's act of drawing gun and handcuffing suspect at the outset of stop did not morph Terry stop into unlawful arrest); *United States v. Moore*, No. 1:19-CR-84-HAB, 2020 WL 3170337, at *3 (N.D. Ind. June 15, 2020) (finding officers' acts of drawing guns, ordering defendant to the ground, handcuffing him and placing him in squad car

did not transform the stop into an arrest); see also, *United States v. Smith,* 3 F.3d 1088 (7th Cir. 1993) (handcuffing does not automatically convert *Terry* stop into an arrest); *United States v. Serna–Barreto*, 842 F.2d 965, 968 (7th Cir. 1988) (officers' drawing guns did not automatically escalate investigatory stop into an arrest where officers' safety required such a measure).

Initially, the occupants here were not handcuffed or otherwise physically restrained, they were not placed in a squad car, the officers did not have weapons drawn or engage in any forcible acts, and there is no evidence that officers demeanor or verbal commands were so abusive or aggressive as to change the stop into an arrest. To the extent, any show of force can be said to have been used here, it is minimal and justified by the facts within the knowledge of the officers at the time of the stop. Thus, Wright was not "arrested" at the time he was seated on the curb.

Next, Wright asserts that the officers had no reason to conduct a search of the vehicle. "When effecting a *Terry* stop, which is always a stop made at 'close range,' police officers must make a quick decision about how to protect themselves and others from possible danger." *Moore*, 2020 WL 3170337, at *3. Indeed, the Supreme Court has long emphasized the precarious nature of traffic stops, *see e.g. Pennsylvania v. Mimms*, 434 U.S. 106, 110 (1977)(recognizing the "inordinate risk confronting an officer as he approaches a person seated in an automobile."); *Michigan v. Long*, 463 U.S. 1032, 1049 (1983) (noting that "roadside encounters between police and suspects are especially hazardous"); *Wilson*, 519 U.S. at 413 (noting the same risk applies "whether the occupant of the stopped car is a driver or passenger"). Because of these dangers, the Supreme Court has blessed the protective sweep of a vehicle where an officer has reasonable suspicion that a weapon may be in the vehicle or that a passenger or driver may be able to gain immediate control of a weapon. *Long*, 463 U.S. at 1049-50; *United States v. Arnold*, 388 F.3d 237, 239 (7th Cir. 2004).

In the Government's view, that is precisely what occurred here – a permissible protective sweep. As the Government argues, the officers observed suspicious behavior and secretive movements as they initiated the stop of the vehicle. One rear passenger had his body bent down as if secreting something under the seat and, as they approached the vehicle, they observed Wright's hand in the Gucci bag. These acts, the Government urges, gave rise to a justifiable concern by officers that there may be a weapon or contraband in the vehicle. Added to these concerns are the fact that officers were outnumbered and the unrestrained vehicle occupants were a mere 10 feet from the vehicle. Finally, the officers credibly testified that from their experience that it is not unusual for suspects to attempt to gain access to a stopped vehicle or re-enter the vehicle to retrieve items. In light of all this, the Court finds that the officers' actions were reasonable under the circumstances and the search of the vehicle was justified to protect the officers while they investigated the stop.

Finally, Wright asserts that once the firearm was located in the vehicle, he was placed under arrest without probable cause. He points to the fact that he was handcuffed and locked inside a squad car. He further maintains that the arrest lacked probable cause because the officers did not, at the time they placed him in handcuffs and inside the squad car, have any information that his possession of the firearm violated the law. The Government responds similarly in fashion to its initial defense of the stop.

Employing the same analysis as this Court did *supra* relating to the initial detention of the occupants, the Court finds nothing improper about Officer Chapman's decision to handcuff Wright and detain him inside the squad car once he found the firearm and while he conducted further investigation. The same facts that justified the initial detention continued to exist but now, officers had the additional information that a firearm was present in the vehicle. Indeed, "[t]he possibility

of a violent encounter stems not from the ordinary reaction of a motorist stopped for a speeding violation, but from the fact that evidence of a more serious crime might be uncovered during the stop. And the motivation of a passenger to employ violence to prevent apprehension of such a crime is every bit as great as that of the driver." *Wilson*, 519 U.S. at 414. Here, once the gun was found in the very bag Wright had his hands in at the outset of the stop, there was justification to detain Wright (and secure him) to make certain he legally possessed the weapon. This is particularly true given the suspicious and furtive behavior that the officers had witnessed at the stop's outset. Wright was not detained and handcuffed and in the squad car for any extended period of time, which would signify a conversion of the stop into an arrest. As the Government points out, he was handcuffed for a mere 10 minutes while officers questioned the other 3 occupants and determined that he was not lawfully permitted to have a firearm. Although there is no bright-line rule to determine the permissible duration of a *Terry* stop, *United States v. Robinson*, 30 F.3d 774, 784 (7th Cir. 1994), the Court is confident that the 10 minute detention of Wright in the squad car was well within the parameters case law has set for *Terry* detentions, *see Bullock*, 632 F.3d 1004 (detention of suspect for 30-40 minutes reasonable investigatory detention); *United States v. Vega,* 72 F.3d 507, 515 (1995) (one hour detention in squad car did not transform *Terry* stop into arrest). No Fourth Amendment violation occurred.

## CONCLUSION

Based on the foregoing, the Defendant's Motion to Suppress (ECF No. 16) is DENIED. SO ORDERED on June 7, 2021.

                                                s/ Holly A. Brady
                                                JUDGE HOLLY A. BRADY
                                                UNITED STATES DISTRICT COURT